UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DAPHNE MOORE**<br><br>**Defendant** | Crim. No. 18-CR-30001-WGY |

### MOTION FOR RECONSIDERATION OF MEMORANDUM AND ORDER AND TO CONTINUE TRIAL DATE TO ALLOW FOR RECONSIDERATION

The United States of America hereby respectfully submits this motion for reconsideration of the Amended Memorandum and Order issued on June 3, 2019 (Docket Entry No. ("DE") 422), allowing the Motions to Suppress Pole Camera Surveillance Video filed by Defendants Daphne Moore (DE 326) and Nia Moore Bush (DE 358). The Government previously filed an Opposition to Defendants' Motions to Suppress Pole Camera Evidence (DE 367), and the matter was argued by both parties on May 13, 2019. See Transcript of May 13, 2019 Motion to Suppress and Final Pretrial Hearing attached as Exhibit A.

The United States also requests that the Court continue the trial date from June 10, 2019 to June 17, 2019 to allow for time to consider the request, and provide clarity to the witnesses, jury pool, court staff, and other personnel regarding the trial date. There are a number of civilian witnesses in the trial that do not live in Massachusetts, and the Government has arranged for travel and other logistics based on a June 10, 2019 trial date. In order to allow the Court to consider the motion for reconsideration, including the review of the proposed trial exhibits that

the Government is attaching to this motion, the Government requests a continuance of the trial date for one week, to facilitate the logistical planning and conservation of resources.

> **I.    There Was No Unique or New Technology Used in the Investigation that Implicates the Concerns of *Carpenter* or Impacts the Analysis of the Defendants' Objective Expectation of Privacy**

The Court found that the pole camera used in the case was "unique in this Court's experience" and suggested that the ability for law enforcement to, while monitoring the camera, pan, tilt, or zoom the camera seemed to be a "new development." DE 422 at 23-24. The Court supported this analysis by comparing the Government's argument that the Defendants had not "pointed to any video or still images taken with the pole camera that impeded into a private space or indicated the use of a sophisticated new technology that raises new questions regarding what is objectively reasonable" with Defendant Moore's claims about "recommended must-have features" of pole cameras. Id., comparing DE 367 3, n.1 with DE 326 at 6. Defendant Moore's argument about "recommended" features was supported with a citation to the website "PoliceOne.com" and an article "Sponsored by" a technology company that markets pole cameras to police departments.[1] This is an advertisement. There is no evidence in the record that a product advertised by this company was used in the case, or that any of the features discussed in the press release cited to by the Defendant are new. As the Government noted, the Defendants failed to offer any factual examples of how any of the actual images captured by the camera were at all unusual, different, or more invasive than the images that have been captured by pole cameras for many years in a variety of investigations. To the contrary, the actual

---

[1] See: https://www.policeone.com/police-products/technology/pole-cameras/press-releases/481702011-8-must-have-features-of-law-enforcement-pole-cameras/ (Last visited June 4, 2019.)

images and videos that the Government intends to introduce at trial are the exact type of images and video that have long been used in investigations and trials in this District.  See Exhibits B-P (marked for trial as Exhibits 195-209, which have been listed on the Government's Exhibit List filed under seal with the Court and provided to Defendant Moore).

Indeed the pole camera at issue in this case appears to be no different from or even less technologically advanced than the pole cameras that the Court distinguished in its Order.  *See* DE 422 14, 23 (citing *United States v. Kay*, No. 17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018), *United States v. Tirado*, No. 16-CR-168, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018), and *United States v. Tuggle*, No. 16-CR-20070-JES-JEH, 2018 WL 3631881 (C.D. Cal. July 31, 2018)).  The record in each of these cases suggests if not explicitly states that the pole cameras upheld in those cases could remotely zoom and tilt.  Agents in the *Tuggle* case, "could remotely operate the cameras to zoom, pan, and tilt" the pole camera, view it in real time, and the "data was stored on a server at the FBI[.]"  *Tuggle*, 2018 WL 3631881, at *1.  Like the *Tuggle* pole camera, the ATF pole camera at issue in the instant case was operable remotely and stored the data commensurate with standard pole camera technology.  *See* DE 367 at 3.  Moreover, the pole cameras upheld in *Tuggle* had more sophisticated technology than the one at issue in the instant case because they "were equipped with rudimentary lighting technology to minimally assist the cameras' operation at night."  *Id.*  Nonetheless, the district court upheld the pole cameras post-*Carpenter*.  Similarly, in the Report and Recommendation adopted in *Kay*, the Magistrate Judge states that the agents "could view the surveillance footage in real time" and "also zoom and pan the camera, but they rarely did so."  *United States v. Kay*, No. 17-CR-16, Report & Recommendation, 2018 WL 4375183, at *1 (E.D. Wis. Apr. 23, 2018), *adopted* 2018

WL 3995902 (E.D. Wis. Aug. 21, 2018).   This implies that the capacity to zoom and pan and view in real time was remote, as in the instant case.   The pole cameras at issue in the *Tirado* case also were located on utility poles and could "zoom in and out and focus on a particular object."   *United States v. Tirado*, No. 16-CR-168, 2018 WL 3245204 (E.D. Wis. Jan. 26, 2018), *aff'd* 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018).   Nothing in the record in the *Tirado* or *Kay* cases suggests or states that the agents had to go to the scene (atop the utility pole) to manually zoom, and the record instead suggests that the ability to zoom was remote.

The Defendants appear to have strategically chosen not to introduce any images to support their argument that they had an objectively reasonable expectation of privacy in the driveway and the corner of their home, instead electing to raise the specter of new technology in an attempt to bootstrap their suppression arguments onto the privacy concerns that the Supreme Court discussed in <u>Carpenter v. United States</u>, 138 S. Ct. 2206 (2018).   The Court notes several times in the Memorandum and Opinion that the images were captured in a "digitally searchable log."   DE 422 at 21, 23, 25.   This is simply a recording.   The evidence in the record was not disputed:   the video captured can be moved forward or backward in time, and the viewer can move to a particular date or time.   There was no evidence in the record to support an inference that it is a new development that pole camera evidence is being captured by a recording—to the contrary, the fact that pole camera surveillance video and images have long been used at trial evidence that they are recorded.   And there was no evidence in the record of any additional search functionality, or any basis for a conclusion that are new features.   To the contrary, even a VHS tape recording can move forward and backward in time to a specific date/time stamp.   Further, there was no basis in the record for the conclusion that there was any type of "log"

created by the camera. Instead, what the Defendants received in discovery were the notes law enforcement agents made while monitoring the camera live and remotely. Again, it appears to have been a strategic decision by the defense not to introduce such evidence into the record, as it would have demonstrated that this is not new technology, but rather a long-standing law enforcement technique.

The pole camera used in the investigation allowed law enforcement agents to pan, tilt, or zoom the camera when they were monitoring the output, in order to focus on areas of interest. This was discussed at the hearing and was not disputed. The Government analogized this feature to a law enforcement agent using binoculars to improve his view during live surveillance. DE 367 at 3. And the Court noted the similarity in this view to a traditional stakeout. If the Government had rented the home across the street from the Defendants' and rotated agents through to conduct live surveillance, they could have employed the same techniques when there was activity of investigative significance. They could have also turned on a video camera. Capturing and focusing on activities that law enforcement has a contemporaneous interest in is, again, a core and traditional law enforcement surveillance technique. There was thus no factual basis for the Court's finding that "the Pole Camera, as used here, does not constitute a "conventional security technique[.]" DE 422 at 24.

There was no basis in the record to find that any images captured by the pole camera violated the Defendant's objectively reasonable expectation of privacy in the view of their driveway and a portion of their home. There was also no basis in the record to find that the type of pole camera used, or the way in which it was used, was new, unique, or beyond the conventional surveillance techniques used by law enforcement. There is thus no basis to find

that the Supreme Court's decision in Carpenter controlled.  The Government respectfully requests that the Court reconsider the basis for the ruling on these grounds.

    **II.**    **There was No Factual Basis for the Inference of a Subjective Expectation of Privacy in the Exterior of the Home and Driveway**

The Court also determined that the Defendants had a subjective expectation of privacy in the view from the pole camera across the street from their home, based on an inference drawn from the Defendant's "choice of neighborhood and home within it."  DE at 9.  There were no facts in the record regarding the circumstances (when, how, why) the Defendants came to live in the home.  Nor were there facts regarding the surrounding neighborhood and the homes.  The undisputed facts were simply that:  (1) the Defendants lived in the City of Springfield; (2) they lived in a "quiet, residential neighborhood;" and (3) there was a tree between the pole camera and the front of the home.  The Defendants again did not seek to introduce any evidence showing the actual view of the exterior of the home, which may have been because doing so would have undermined their argument that the lone tree supported an inference of a subjective expectation of privacy.  In fact, the evidence that the Government intends to introduce at trial was from November 2017 through January 2018.  See Exhibits B-P.  At that time, there was no obstruction—the leaves had fallen and the view was clear.  Moreover, it is clear from images taken during the warmer months that the leaves blocked the view of the pole camera, but did not obstruct the view of the driveway and the home from other areas, including the public street. See Exhibit (Q).  Not only were these images available to the Defendant, but the record was also clear that there was no evidence that the tree was on the Defendants' property.  Thus, the Court lacked a basis to infer a subjective expectation of privacy in the view of the driveway and home captured by the pole camera.

### III. The Evidence Should Not Be Suppressed Because the Government Relied in Good Faith on First Circuit Precedent

In *Davis v. United States*, the Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." 564 U.S. 229, 241 (2011). The Court found that this conclusion flowed from the reasoning of prior good-faith decisions that "the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue," and that exclusion is not warranted where "police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence." Id. at 238 (internal punctuation marks and citations omitted). In *United States v. Sparks*, the First Circuit held that the precedent in question must be "clear and well-settled," but that the facts of the case need not be identical to those addressed in the prior precedent, finding that the placement and monitoring of a GPS device on a car could be upheld under a good-faith analysis based on earlier cases involving the installation and monitoring of a beeper, notwithstanding the greater capabilities of the GPS device. 711 F.3d 58, 66 (1st Cir. 2013).

The *Davis* good faith exception applies here and precludes suppression of the government's pole camera evidence. In *United States v. Bucci*, the First Circuit expressly addressed and rejected a claim that law enforcement officers violated the Fourth Amendment when they "installed a video camera on a utility pole across the street from Bucci's home and conducted surveillance of the front of his house for eight months." 582 F.3d 108, 116 (1st Cir. 2009). The Court found that Bucci had failed to establish either a subjective or objectively reasonable expectation of privacy, finding it "clear" that Bucci did not have an expectation of

7

privacy in the front of his house or the open garage as visible from the street because these areas were exposed to public view.  Id.

In its memorandum and order, this Court properly rejected the defendants' argument that Bucci was factually distinguishable because the pole camera in that case may have lacked certain capabilities present in the camera here (such as the ability to change its view or magnification remotely).  DE 422; *Bucci*, 582 F.3d at 116.  Whatever the differences between the pole cameras, they are smaller than those between a tracking beeper and a GPS device the First Circuit found constitutionally insignificant in Sparks.  See 711 F.3d at 66.  Because the actions taken by law enforcement in this case were plainly within the scope of existing precedent, exclusion of the evidence was plainly improper under Davis even if the court were correct (which the government disputes) that the reasoning of Bucci has been undermined by subsequent Supreme Court precedent.

                                Andrew E. Lelling
                                United States Attorney

By:   */s/ Amy Harman Burkart*
       AMY HARMAN BURKART
       KATHARINE A. WAGNER
       Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and by hand at the Clerk's Office.

>        */s/ Amy Harman Burkart*
>        Amy Harman Burkart
>        Assistant United States Attorney

Date:   June 4, 2019