# United States Court of Appeals
## For the First Circuit

---

Nos. 19-1582
19-1625

UNITED STATES,

Appellant,

v.

NIA MOORE-BUSH, a/k/a Nia Dinzey,

Defendant, Appellee.

---

Nos. 19-1583
19-1626

UNITED STATES,

Appellant,

v.

DAPHNE MOORE,

Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Howard, Chief Judge,
Lynch and Barron, Circuit Judges.

---

Randall E. Kromm, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, was on brief, for

appellant.

    Judith H. Mizner, Assistant Federal Public Defender, for appellee Nia Moore-Bush, a/k/a Nia Dinzey.

    Linda J. Thompson, with whom John M. Thompson and Thompson & Thompson, P.C. were on brief, for appellee Daphne Moore.

    Matthew R. Segal, Jessie J. Rossman, Kristin M. Mulvey, American Civil Liberties Union Foundation of Massachusetts, Nathan Freed Wessler, Brett Max Kaufman, and American Civil Liberties Union Foundation on brief for American Civil Liberties Union and American Civil Liberties Union of Massachusetts, amici curiae.

    Trisha B. Anderson, Alexander A. Berengaut, Jadzia Pierce, and Covington & Burling LLP on brief for Center for Democracy & Technology, amicus curiae.

------------

June 16, 2020

------------

LYNCH, **Circuit Judge**.   This appeal by the prosecution raises the question of whether the Supreme Court's opinion in Carpenter v. United States, 138 S. Ct. 2206 (2018), a cell phone location automatic tracking technology case, provides a basis for departing from otherwise binding and factually indistinguishable First Circuit precedent in United States v. Bucci, 582 F.3d 108 (1st Cir. 2009), and Supreme Court precedent, including Katz v. United States, 389 U.S. 347 (1967), on which Bucci is based.   In departing from that precedent and suppressing evidence obtained from a pole camera, the district court erred by violating the doctrine of stare decisis.

Under the doctrine of stare decisis, all lower federal courts must follow the commands of the Supreme Court, and only the Supreme Court may reverse its prior precedent.   The Court in Carpenter was concerned with the extent of the third-party exception to the Fourth Amendment law of reasonable expectation of privacy and not with the in-public-view doctrine spelled out in Katz and involved in this case.

Carpenter was explicit: (1) its opinion was a "narrow" one, (2) it does not "call into question conventional surveillance techniques and tools," and (3) such conventional technologies include "security cameras." Carpenter, 138 S. Ct. at 2220.   Pole cameras are a conventional surveillance technique and are easily

thought to be a species of surveillance security cameras.  Thus, Carpenter, by its explicit terms, cannot be used to overrule Bucci.

The district court erred for other separate reasons as well.  The Bucci decision firmly rooted its analysis in language from previous Supreme Court decisions, including Katz, Smith v. Maryland, 442 U.S. 735 (1979), California v. Ciraolo, 476 U.S. 207 (1986), and Kyllo v. United States, 533 U.S. 27 (2001).  Bucci, 582 F.3d at 116-17.  The Court in Carpenter was clear that its decision does not call into question the principles Bucci relied on from those cases.  Carpenter, 138 S. Ct. at 2213-19.

The district court also transgressed a fundamental Fourth Amendment doctrine not revoked by Carpenter, that what one knowingly exposes to public view does not invoke reasonable expectations of privacy protected by the Fourth Amendment.  This understanding, as explained by Justice Scalia in Kyllo, was part of the original understanding of the Fourth Amendment at the time of its enactment.  Kyllo, 533 U.S. at 31-32.

Affirming the district court's order would mean violating the law of the circuit doctrine, that "newly constituted panels in a multi-panel circuit court are bound by prior panel decisions that are closely on point."  San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010).  Although there are two exceptions to the doctrine, "their incidence is hen's-teeth-rare."  Id.  And neither exception is applicable here.

The argument made in support of the district court's suppression order is that the logic of the opinion in Carpenter should be extended to other technologies and other Fourth Amendment doctrines, and this extension provides a basis to overturn this circuit's earlier precedent in Bucci.  Nothing in Carpenter's stated "narrow" analysis triggers the rare second exception to the law of the circuit doctrine.  Carpenter, 138 S. Ct. at 2220.

The defendants thus ask us to violate the vertical rule of stare decisis, that all lower federal courts must follow the commands of the Supreme Court and that only the Supreme Court may reverse its prior precedent, and the law of the circuit, binding courts to follow circuit precedent.  See Bryan A. Garner et al., The Law of Judicial Precedent 21-43 (2016).  Affirming the district court would also violate the original understanding of the Fourth Amendment.

I.

A.   The Investigation and Indictments

The following facts are undisputed.  Following a tip from a cooperating witness ("CW"), the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began investigating defendant Nia Moore-Bush in January 2017 for the unlicensed sale of firearms. About a month into the investigation, in February 2017, Moore-Bush and her then-boyfriend, later-husband, Dinelson Dinzey moved in with Moore-Bush's mother, defendant Daphne Moore, at 120 Hadley

Street in Springfield, Massachusetts, in a quiet residential
neighborhood.  At the time, Moore was a lawyer and Assistant Clerk
Magistrate for the Hampden County, Massachusetts, Superior Court.
Moore-Bush and Dinzey lived at the property "off and on" for the
period relevant to this appeal.

        The government had evidence that 120 Hadley Street,
Moore's property, was the site of illegal activity even before
installation of the pole camera.  For example, on May 5, 2017, the
CW, acting on the government's orders, wore a recording device and
purchased four guns illegally from Moore-Bush, through Dinzey, at
that location.

        Approximately two weeks later, on or about May 17, 2017,
ATF installed a camera towards the top of the public utility pole
across the public street from the unfenced-in house at 120 Hadley
Street (the "pole camera").  The record is silent as to whether
the camera was visible.  The camera was used until mid-January
2018, when Moore-Bush and Dinzey were arrested.  Investigators did
not seek any judicial authorization to install the pole camera and
did not need to do so under the law at that time in May of 2017.
The images from the pole camera captured one side of the front of
Moore's house.  The camera did not capture the house's front door;
it did show the area immediately in front of the side door, the
attached garage, the driveway to the garage, part of the lawn, and
a portion of the public street in front of the house.  A tree in

the front yard, when it had leaves, partially obstructed the camera's view.

The government also from time to time had investigators conduct physical surveillance of these same areas, and presumably more areas, from the public street. Those surveillance officers could see everything the pole camera could see, and even more. The tree, when it had leaves, did not obstruct their view. The record is silent as to whether the officers on the street used cameras, binoculars, or the like, but during physical surveillance they were often close enough to observe and record license plate numbers of vehicles in the driveway.

The district court declined to hold an evidentiary hearing on the technical capabilities of the pole camera; nonetheless, the following is established by the record. The pole camera operated 24/7. Officers could access the video feed either live or via recordings. When they were watching the pole camera's live stream, but only then, officers could control the camera's zoom, pan, and tilt features remotely, akin to what an observer on the street could see with or without visual aids. The zoom feature was powerful enough for officers observing live to read the license plates on cars parked in the driveway. The camera's resolution was much lower at night in the darkness. Regardless of the zoom feature, the pole camera could not capture anything happening inside of the house. Everything it captured was visible to a

passerby on the street. The pole camera did not and could not capture audio, and so captured no sound, even sounds which could be heard on the street. The record does not indicate what the pole camera looked like or its manufacturer.

The camera did not cover or capture all aspects of life at 120 Hadley Street. According to an affidavit from a government investigator appended to one of the wiretap applications, the pole camera footage was only of limited use because it captured just a portion of the front of the house, was partially obstructed by a tree, and had to be monitored live in order to use the zoom feature to see faces, license plates, and other details clearly.

The government used different investigative tools over time to investigate Moore-Bush and those thought to be co-conspirators at this location, including using a CW and having officers conduct physical surveillance of the property. Warrants were obtained, based in part on the pole camera evidence. Pursuant to warrants, law enforcement tracked suspects' locations using cell phone location data. Pursuant to warrants, investigators mounted GPS trackers on suspects' vehicles. Pursuant to a warrant, officers searched the private contents of Dinzey's Facebook account. Pursuant to court orders, officers installed pen registers and trap and trace devices on several cell phones. They received judicial authorization to wiretap several phones. They also listened to consensually recorded jail calls made by Moore's

long-time romantic partner, who they believed was also involved in illegal activities; looked through discarded trash; and subpoenaed financial and other records.

The pole camera recorded useful evidence throughout its duration.  The record shows that officers included evidence from the pole camera, along with many other pieces of evidence, in successful wiretap and search warrant applications starting in July 2017 and continuing throughout the fall and winter.  This usefulness explains the eight-month duration of the use of the camera.

By the end of 2017, the government was prepared to bring charges that Moore-Bush and Dinzey were trafficking narcotics from Springfield to Vermont, where they would exchange drugs for cash, firearms, and other valuables.  A federal grand jury indicted Moore-Bush, Dinzey, and three others from Vermont as co-conspirators, but not the mother Moore, on January 11, 2018, for conspiracy to distribute and possess with intent to distribute heroin and twenty-eight grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(iii).  Moore-Bush and Dinzey were arrested the following day.  The pole camera, which at this point had been up for about eight months, was removed soon after her arrest, in "mid-January 2018."

Over the course of 2018, the government gathered evidence that Moore was involved in her daughter's drug trafficking

scheme, in part based on evidence that Moore-Bush was depositing cash from her drug sales into bank accounts in Massachusetts and Vermont held by Moore in trust for Moore-Bush. Almost a year after the original indictment, on December 20, 2018, the grand jury returned a superseding indictment naming Moore-Bush,[1] Dinzey, the three Vermont co-conspirators, and adding three other co-conspirators and Moore, Moore-Bush's mother.[2]

Moore was charged with one count of conspiracy to distribute and possess with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 846 (Count One); one count of distribution and possession with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. § 841(a)(1) on November 17, 2017 (Count Three); one count of money

---

[1]     Moore-Bush was charged with one count of conspiracy to distribute and possess with intent to distribute heroin, cocaine, and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii) (Count One); five counts of distribution and/or possession with intent to distribute narcotics, in violation of 21 U.S.C. § 841(a)(1) (Counts Two through Six); two counts of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Counts Seven and Eight); seven counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1) (Counts Eleven and Fourteen through Nineteen); one count of conspiracy to deal firearms without a license, in violation of 18 U.S.C. § 371 (Count Twenty); two counts of dealing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A) (Counts Twenty-One and Twenty-Two); and one count of aiding and abetting the possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 2 (Count Twenty-Three).

[2]     The superseding indictment also removed one of the original Vermont co-conspirators.

laundering conspiracy in financial transactions in Hampden County, Massachusetts, Washington County, Vermont, and elsewhere, in violation of 18 U.S.C. § 1956(h) (Count Eight); multiple counts of money laundering in those same locations, in violation of 18 U.S.C. § 1956(a)(1) with her daughter at T.D. Bank (Counts Fourteen through Nineteen); one count of making false statements to federal agents around January 12, 2018, in violation of 18 U.S.C. § 1001 (Count Twenty-Four); and a drug forfeiture charge.

B.   The Motions to Suppress and District Court Opinion

On April 22, 2019, Moore moved to suppress the pole camera evidence and the fruits of that evidence.  Moore-Bush filed a very similar motion on May 2, 2019.  The motions argued that the government's use of the pole camera was a search under the Fourth Amendment to the United States Constitution that required judicial authorization.   They argued they had both subjective and objectively reasonable expectations of privacy in "the whole of [their] physical movements in and out of [their] home for a period of eight months."[3]  They argued the entire recording over the eight

---

[3]      They did not argue that the government had "physically intrud[ed]" onto their property under the "trespass" theory of Fourth Amendment searches.  See Florida v. Jardines, 569 U.S. 1, 5 (2013).  Indeed, the pole on which the camera was installed was a public utility pole across the street from Moore's home and not on her property.

months was a search, and they did not attempt to define what period of time the government might legally have recorded them, if any.

Moore-Bush and Moore acknowledged that the Bucci decision from this circuit upheld the constitutionality of a pole camera that also operated for eight months. They argued that Bucci was no longer controlling precedent because "[t]he search and seizure landscape, particularly regarding the scope of individual privacy rights, has changed considerably since Bucci was decided." In particular, they pointed to the Supreme Court case Carpenter v. United States. They also cited Florida v. Jardines, 569 U.S. 1 (2013), and United States v. Jones, 565 U.S. 400 (2012). They did not argue that the good faith exception could not apply or that probable cause did not exist.

The government opposed the motions to suppress on May 6, 2019, addressing its arguments to the grounds Moore-Bush and Moore asserted in their motions. It argued that neither defendant had shown enough to support a finding of a subjective expectation of privacy. Further, it argued that Bucci was controlling and Bucci directly foreclosed any argument that Moore-Bush or Moore had an objectively reasonable expectation of privacy in the front of their home. It argued Carpenter did not impact, much less overrule, Bucci because Carpenter was a "narrow" decision about cell-site location information that did not "call into question conventional surveillance techniques and tools, such as security cameras."

Carpenter, 138 S. Ct. at 2220.  And the government argued Jardines
and Jones could not overrule Bucci because those cases primarily
dealt with physical trespass, which is not at issue in this case.
The government did not argue at any time that probable cause
existed for either the installation of the pole camera or its
eight-month duration.  In its opposition, the government did not
raise the good faith exception to argue that, regardless, the
evidence could not be suppressed.

          The district court heard oral argument on the motions on
March 13, 2019.  On June 4, 2019, it released a memorandum and
order granting Moore-Bush and Moore's motions to suppress.[4]  In
its order, the court found that both defendants subjectively
"expected privacy in the whole of their movements over the course
of eight months from continuous video recording with magnification
and logging features in the front of their house."  The court held
that defendants' direct and imputed subjective privacy interests
were "infer[red]" from their choice to live in a home in a quiet
suburban neighborhood.  The court reasoned that persons who live
in quiet suburban neighborhoods have greater privacy interests
than persons who live in other neighborhoods.

          The court held that Bucci was not controlling because of
the Supreme Court's decision in Carpenter, which it found freed it

---

          [4]     The June 4, 2019, order made minor, non-substantive
corrections to an otherwise identical order from June 3, 2019.

to reevaluate the issue of whether warrantless pole camera surveillance requires a warrant. The district court held that: "(1) continuous video recording for approximately eight months; (2) focus on the driveway and front of house; (3) ability to zoom in so close that [the pole camera] can read license plate numbers; and (4) creation of a digitally searchable log" made the use of the pole camera a search. It did not determine if any discrete part of the recording was not a search or at what point during the duration of the pole camera's recording a warrant was required. It simply suppressed the entirety of the pole camera evidence.

Since no exception under <u>Davis</u> v. <u>United States</u>, 564 U.S. 229, 239 (2011), was raised by the government in its opposition to the defendants' suppression motions, the district court considered any government argument as to the good faith exception to have been waived. The court suppressed all evidence obtained directly by the pole camera, but "[took] no action with regard to evidence collected <u>indirectly</u> from the Pole Camera."[5]

The government filed a motion for reconsideration on June 4, 2019. For the first time in the proceedings, it attached the specific photos and videos from the pole camera that it

---

[5] On June 6, 2019, Moore filed a "Renewed Motion for Evidentiary Hearing on Derivative Evidence and Suppression of Evidence Derived From Fruits of Pole Camera Surveillance," with argument on this point. The district court has not ruled on it yet because of these appeals.

intended to introduce at trial.  Based on those photos and the record as a whole, it argued that the district court had inaccurately exaggerated the pole camera's technical capabilities.  Citing <u>Davis</u> and <u>United States</u> v. <u>Sparks</u>, 711 F.3d 58 (1st Cir. 2013), for the first time, the government argued that the good faith exception to the Fourth Amendment's exclusionary rule should apply and permit it to introduce the pole camera evidence even if the evidence were unconstitutionally obtained.

The district court denied the motion for reconsideration on June 5, 2019.  On June 6, 2019, the government appealed the suppression order.  On June 19, 2019, it appealed the order denying reconsideration.

II.

A.    <u>The Doctrine of Stare Decisis Controls This Case</u>

The doctrine of stare decisis comes from the Latin maxim "stare decisis et non quieta movere," meaning "to stand by the thing decided and not disturb the calm."  <u>Ramos</u> v. <u>Louisiana</u>, 140 S. Ct. 1390, 1411 (2020) (Kavanaugh, J., concurring in part).  "The doctrine of <u>stare decisis</u> renders the ruling of <u>law</u> in a case binding in future cases before the same court or other courts owing obedience to the decision."  <u>Gately</u> v. <u>Massachusetts</u>, 2 F.3d 1221, 1226 (1st Cir. 1993).  It "precludes the relitigation of legal issues that have previously been heard and authoritatively determined."  <u>Eulitt ex rel. Eulitt</u> v. <u>Me., Dep't of Educ.</u>, 386

F.3d 344, 348 (1st Cir. 2004) (citing <u>Stewart</u> v. <u>Dutra Constr.
Co.</u>, 230 F.3d 461, 467 (1st Cir. 2000) (subsequent history
omitted)).

The role of stare decisis is to "keep the scale of
justice even and steady, and not liable to waver with every new
judge's opinion." <u>Ramos</u>, 140 S. Ct. at 1411 (Kavanaugh, J.,
concurring in part) (quoting 1 W. Blackstone, Commentaries on the
Laws of England 69 (1765)). It is "a foundation stone of the rule
of law." <u>Allen</u> v. <u>Cooper</u>, 140 S. Ct. 994, 1003 (2020) (quoting
<u>Michigan</u> v. <u>Bay Mills Indian Cmty.</u>, 572 U.S. 782, 798 (2014)).

The doctrine is commonly divided into horizontal and
vertical precedent. <u>See</u> Garner et al., <u>supra</u>, at 27. Vertical
precedents are decisions in "the path of appellate review," meaning
Supreme Court decisions control all lower federal courts and
circuit court decisions control federal district courts in their
circuits. <u>Id.</u> at 28 (citing Evan H. Caminker, <u>Why Must Inferior
Courts Obey Superior Court Precedents?</u>, 46 Stan. L. Rev. 817, 825
(1994)). Courts are absolutely bound to follow vertical
precedents. <u>Id.</u> at 27.

The Supreme Court has repeatedly stressed the importance
of <u>both</u> circuit and district courts faithfully following vertical
precedent. <u>See Thurston Motor Lines, Inc.</u> v. <u>Jordan K. Rand, Ltd.</u>,
460 U.S. 533, 535 (1983) (per curiam) ("Needless to say, only this
Court may overrule one of its precedents."); <u>Hutto</u> v. <u>Davis</u>, 454

- 16 -

U.S. 370, 375 (1982) (per curiam), reh'g denied, 455 U.S. 1038
(1982) ("[U]nless we wish anarchy to prevail within the federal
judicial system, a precedent of this Court must be followed by the
lower federal courts no matter how misguided the judges of those
courts may think it to be."); see also Eberhart v. United States,
546 U.S. 12, 19-20 (2005) (praising the Seventh Circuit for
following Supreme Court precedent despite its doubts).

        The law of the circuit doctrine protects horizontal
precedent, or precedent from the same court, meaning that generally
"a prior panel decision shall not be disturbed."  United States v.
Lewko, 269 F.3d 63, 66 (1st Cir. 2001).  The law of the circuit
doctrine has two recognized, narrow exceptions, but "their
incidence is hen's-teeth-rare."  San Juan Cable LLC, 612 F.3d at
33.  The first exception applies when "the holding of the prior
panel is 'contradicted by controlling authority, subsequently
announced.'"  Id. (quoting United States v. Rodríguez, 527 F.3d
221, 225 (1st Cir. 2008)).[6]  The second exception, which is even
more uncommon, applies only in those "rare instances in which
authority that postdates the original decision, although not
directly controlling, nevertheless offers a sound reason for

_____

        [6]    No one contends that Carpenter directly overrules prior
law approving the use of pole cameras by law enforcement without
obtaining a warrant, the first exception to the law of the circuit
doctrine.

believing that the former panel, in light of fresh developments, would change its collective mind." Id. (quoting Williams v. Ashland Eng'g Co., 45 F.3d 558, 592 (1st Cir. 1995) (subsequent history omitted)).[7]

The respecting of both kinds of precedent is essential at all levels in the operation of the federal courts. As the Supreme Court recently explained, stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Kisor v. Wilkie, 139 S. Ct. 2400, 2422 (2019) (quoting Payne v. Tennessee, 501 U.S. 808, 827 (1991)).

The Supreme Court has decided several recent appeals based on stare decisis. In Allen v. Cooper, for instance, the Court looked to not only the relevant precedent's narrow legal holding but also its method of analysis. See Allen, 140 S. Ct. at 1003-07. And the Court noted that even it, the final court of appeal in our judicial system, will not overrule past Supreme Court precedent absent a "'special justification' over and above the belief 'the precedent was wrongly decided.'" Id. at 1003. See also Gundy v. United States, 139 S. Ct. 2116, 2123-26 (2019)

---

[7]    Other circuits have an even more restrictive test. See Garner et al., supra, at 492-93.

(following the Court's previous interpretation of the Sex Offender Registration and Notification Act and therefore finding no non-delegation issue); Ramos, 140 S. Ct. at 1390 (discussed more below).

B.    Bucci Built on Supreme Court Case Law and Is Controlling Here

Bucci is a First Circuit case, decided in 2009, which held that the government's use of a pole camera across the street from Bucci's home for eight months was not a search because Bucci did not have an objectively reasonable expectation of privacy in the front of his home.  Bucci, 582 F.3d at 116-17.  That holding is on all fours[8] with the issue presented in Moore-Bush and Moore's

---

[8]    Bucci is not factually distinguishable from the case at hand.  Law enforcement officials installed a video camera on the utility pole across the street from both defendants' houses. Bucci, 582 F.3d at 116.  Both cameras were directed at the respective homes' garages and driveways.  Id.  Both cameras operated for eight months.  Id.  Both defendants challenged law enforcement's use of a pole camera on Fourth Amendment grounds and moved to suppress the evidence obtained from it.  Id.

There are even more factual similarities. Bucci, like Moore-Bush and Moore, was implicated in a drug trafficking conspiracy.  Id. at 111.  Neither home had fences, gates, or shrubbery to block a passerby's view of the garage or driveway from the street.  Id. at 116-17.  We take judicial notice that the record in the Bucci case makes clear that the pole camera's footage there also could be viewed live and was recorded.  Order Denying Motion to Suppress, United States v. Bucci, No. 1:03-cr-10220-NMG (D. Mass. Dec. 22, 2004), ECF No. 114.  Agents in both cases monitored the footage to track the movements of the houses' inhabitants and guests.  Id.

The only factual difference of any note between the two cases is that law enforcement officers in Bucci were not able to zoom, pan, or tilt the camera remotely while they directly viewed the images in real time.  Bucci, 582 F.3d at 116.  The district

cases. That holding in Bucci relied on basic Fourth Amendment principles explicated by the Supreme Court in cases stretching back decades, and even to the Founders. Those cases relied on in Bucci remain good law today.

Bucci began its analysis by laying out a legal test first established by the Supreme Court in Katz and later formalized in Smith v. Maryland, 442 U.S. at 740. Id. (citing United States v. Rodríguez-Lozada, 558 F.3d 29, 37 (1st Cir. 2009)) (explaining that a reasonable expectation of privacy must be established before a court may reach the merits of a motion to suppress). To establish that he had a reasonable expectation of privacy, "Bucci must show that 1) he 'has exhibited an actual, subjective expectation of privacy' in the area searched; and 2) 'such subjective expectation is one that society is prepared to recognize as objectively reasonable.'" Id. (quoting United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (itself citing Smith, 442 U.S. at 740)).

Bucci focused on the second part of the test about "the lack of a reasonable objective expectation of privacy because this

---

court correctly determined that this distinction is "too thin" to distinguish Bucci.

On appeal, defendants argue that their case is distinguishable from Bucci because they have a privacy interest "in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house," while we described Bucci's privacy interest as an interest "in the front of his home." Id. We reject the attempt to distinguish these two cases merely by describing the same privacy interest with different words.

failure is so clear." Id. (citing United States v. Vilches-Navarrete, 523 F.3d 1, 14 (1st Cir. 2008)). It said that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public," like Bucci's front yard, and held that "[t]hat legal principle is dispositive here." Id. at 117.

Bucci based that statement of law on language from three Supreme Court cases. First, it relied on and cited to a principle from Katz that "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Id. (quoting Katz, 389 U.S. at 351). Then Bucci cited to the part of the Court's decision in Ciraolo, 476 U.S. at 213, that says, "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." Id. Finally, Bucci cited to the portion of Kyllo, 533 U.S. at 31-33, that discusses the lawfulness of unenhanced visual surveillance of a home.[9] Id.

_____

[9] The First Circuit cases cited to in Bucci -- Rodríguez-Lozada, Rheault, and Vilches-Navarrete -- themselves also relied on the Supreme Court's decisions in Smith, Kyllo, and Ciraolo, or circuit precedents based on those cases. In each of those cases, this court rejected that there was a reasonable expectation of privacy as to areas far more private and less accessible to public view than the views here, all visible to anyone on the street. See Rheault, 561 F.3d at 61 (relying on fact tenant could not

C.    Carpenter Directly Prohibits Any Departure from Stare Decisis

No case from the Supreme Court decided since Bucci,
including Carpenter, undermines Bucci or the Supreme Court cases
on which Bucci relied.  To the contrary, Carpenter reaffirms the
analysis the Bucci court undertook by explicitly protecting
conventional surveillance techniques and by repeatedly affirming
the underlying language from Supreme Court cases which Bucci cited
and which provided the rationale of the Bucci decision.  Because
we are strictly bound to apply Supreme Court precedent, this
language in Carpenter prohibits us and the district court from
departing from stare decisis.

The limitations expressed in the Carpenter analyses are
not mere dicta.  We consider both the language protecting
conventional surveillance technology and the reaffirmation of the
existing Fourth Amendment case law quoted in Bucci to be essential
to the Court's holding in Carpenter.

But even if both the analyses and the express limiting
language were dicta, federal circuit and district courts are not
free to ignore them.  See United States v. Santana, 6 F.3d 1, 9
(1st Cir. 1993) ("Carefully considered statements of the Supreme

---

exclude other tenants from a third-floor landing in a building);
Rodríguez-Lozada, 558 F.3d at 37 (stating casual visitor has no
expectation of privacy as to apartment of another); Vilches-
Navarrete, 523 F.3d at 14 (holding there is no reasonable
expectation of privacy in secret apartment under hidden hatch in
maritime vessel).

Court, even if technically dictum, must be accorded great weight
and should be treated as authoritative when, as in this instance,
badges of reliability abound."); McCoy v. Mass. Inst. of Tech.,
950 F.2d 13, 19 (1st Cir. 1991) ("[F]ederal appellate courts are
bound by the Supreme Court's considered dicta almost as firmly as
by the Court's outright holdings, particularly when, as here, a
dictum is of recent vintage and not enfeebled by any subsequent
statement."); see also Pierre N. Leval, Judging Under the
Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1250
(2006) (describing how dicta are "often treated as binding law").

Even beyond Carpenter's expressly stated limitations,
Carpenter did not provide cause to question Bucci for a different
reason. Carpenter concerned whether the doctrine that there can
be no reasonable expectation of privacy in information placed in
the hands of third parties should be extended to the new situation
of the government obtaining from cellular telephone companies over
a period of time cell-site location information ("CSLI").
Carpenter, 138 S. Ct. at 2211. CSLI generates a time-stamped
record of the user's past location whenever a phone accesses the
wireless network, which, for smartphone users, is often several
times a minute. Id. Carpenter holds that the collection of seven
days of CSLI constitutes a search within the meaning of the Fourth
Amendment, but it did not reach the question of the consequences
of data collection over a shorter period. Id. at 2217 n.3.

Carpenter's limitations unquestionably apply here. Pole cameras are conventional, not new, technology.[10] They are the exact kind of "conventional surveillance technique[]" the Court carefully said it was not calling into question. Id. at 2220. Pole cameras have been mentioned in published decisions in our circuit since at least 2003, see United States v. Montegio, 274 F. Supp. 2d 190, 201 (D.R.I. 2003), and outside of the circuit since at least 1987, see United States v. Cuevas-Sanchez, 821 F.2d 248, 250-51 (5th Cir. 1987). This is in sharp contrast to the much more recent technology at issue in Carpenter, which was unique to "modern" phones that "generate increasingly vast amounts of increasingly precise CSLI." Carpenter, 138 S. Ct. at 2212.

Indeed, in common parlance, pole cameras are "security cameras." The Court in Carpenter described "security cameras" as a type of a "surveillance technique[]" that the Court's opinion

---

[10]    The district court erred as to the record, doing so in service of its conclusion that pole cameras, or at least this pole camera, represent a potential new privacy threat. Pole cameras are video cameras. The record does not indicate that the "digitally searchable log" the district court relied on is anything more than a recording that could be started at different points in time, much like VHS tapes. The fact that the camera could zoom, pan, and tilt also does not significantly set it apart from pre-existing technology, especially since these features were only available to officers observing the footage live. Amicus curiae the Center for Democracy & Technology warn us that pole cameras could be abused in the future if the government were to combine them with facial recognition technology or artificial intelligence. But those issues are simply not present in this case.

did not call into question, a longstanding technique routinely
deployed by government and private actors alike.  While there may
be other uses for security cameras, they are clearly used for
surveillance, and that use was specifically referred to by the
Court.  Thus, pole cameras are security cameras in the way that is
relevant for this analysis.[11]

---

[11]    The district court attempted to distinguish pole
surveillance cameras from security cameras by arguing that
security cameras "guard against . . . crime" (alteration in
original), while pole cameras "investigate suspects."  The
concurrence attempts to make a similar distinction.  Both attempts
fail, and neither provides any basis to avoid the rule of stare
decisis.  Most neighborhoods, for their own safety and for other
reasons, do not want crime within their boundaries, and guarding
against crime involves investigating suspects.  Privately owned
cameras routinely record property privately owned by others or
common areas with multiple owners.
        In addition, recordings from privately owned video
cameras have been used many times in this circuit to prosecute
people accused of crimes.  See, e.g., United States v. Smiley,
3:19-CR-00752-RAM, 2019 WL 6529395, at *5 (D.P.R. Dec. 4, 2019)
(discussing the government's use of footage from a privately owned
camera installed on a cruise ship to prove a domestic violence
charge); United States v. Tsarnaev, 53 F. Supp. 3d 450, 458 (D.
Mass. 2014) (discussing evidence obtained from a camera installed
in a Macy's department store).  The attempted distinction, in any
event, misses the point Carpenter was making.
        Similarly, "security cameras" are not exclusively owned
by private parties; they are commonly owned by the government and
are often used for law enforcement purposes.  It is not true that
the government only uses security cameras as if it were acting to
protect its own proprietary interests.  The City of Springfield,
for example, reports on its website that it operates more than
forty cameras located throughout the city to "get a real time look
at resident and business complaints or concerns."  Real Time
Camera's Assist DPW, City of Springfield (Dec. 24, 2013 7:46 AM),
https://www.springfield-ma.gov/dpw/index.php?id=cameras.      The
Massachusetts Bay Transit Authority ("MBTA") has installed
hundreds of cameras on its buses that live-stream footage to
central dispatch and MBTA Transit Police officers' cars.  Martine

In addition, the government argues that <u>Carpenter</u> leaves intact the principles <u>Bucci</u> relies on from Supreme Court precedents in <u>Katz</u> and <u>Ciraolo</u>. We agree. The Supreme Court was clear in <u>Carpenter</u> that its decision does not call into question the language <u>Bucci</u> cited from Supreme Court precedent in <u>Katz</u>, 389 U.S. at 351, <u>Ciraolo</u>, 476 U.S. at 213, and <u>Kyllo</u>, 533 U.S. at 31-33. Two of those cases, <u>Katz</u> and <u>Kyllo</u>, were cited repeatedly throughout the Court's decision in <u>Carpenter</u>. <u>Carpenter</u>, 138 S. Ct. at 2213-19. Indeed, <u>Carpenter</u> cited some of the same language from <u>Katz</u> that was cited in <u>Bucci</u>. <u>Id.</u> at 2213 ("the Fourth Amendment protects people, not places").

Nowhere in the <u>Carpenter</u> opinion does the Court suggest that any of those cases, or any part of the Court's existing Fourth Amendment framework involving the lack of Fourth Amendment protection for places a defendant knowingly exposes to public view, has been overruled or modified. Instead, the opinion was framed as "how to apply the Fourth Amendment to a new phenomenon." <u>Id.</u>

---

Powers, <u>New Cameras Keep Watch on MBTA Buses</u>, The Boston Globe (Feb. 12, 2014), https://www.bostonglobe.com/metro/2014/02/11/begins-installation-bus-security-cameras/Z1QwILHvLb3TgsgOPXa9yM/story.html. When these cameras were installed, the Suffolk County District Attorney commented that they would be useful both to deter crime and to investigate it after it has occurred. <u>Id.</u>
     As said, <u>Carpenter</u> holds that particular surveillance technologies, including security cameras, are not called into question. And even if the limitations in <u>Carpenter</u> were only dicta, the doctrine of stare decisis would apply. <u>See</u> <u>Santana</u>, 6 F.3d at 9.

at 2216.  In Carpenter, the Court refused to extend the third-party doctrine that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties" to long-term monitoring of CSLI.  Id. at 2216 (quoting Smith, 442 U.S. at 743-44).  It explicitly framed its holding in terms of the third-party doctrine, a doctrine not relevant here.  Id. ("We therefore decline to extend Smith and [United States v.] Miller[, 425 U.S. 435 (1976),] to the collection of CSLI.").  Indeed, it specifically criticized Justice Thomas's and Justice Gorsuch's dissents for attempting to revisit Katz when neither party asked the Court to do so.  Id. at 2214 n.1.

The cases cited by Katz, Ciraolo, and Kyllo naturally extend to the circumstances here.  The defendants and the concurrence argue that law enforcement's eight-month use of the pole camera is distinguishable because it was particularly "unrelenting, 24/7, perfect."  But the Court's existing Fourth Amendment case law has already considered and allowed behavior that might be described as "unrelenting" and found no violation of any reasonable expectation of privacy.  Any home located on a busy public street is subject to the unrelenting gaze of passersby, yet "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."  Ciraolo, 476 U.S. at 213.

Conversely, the Court in Carpenter explained why CSLI is different than the information obtained by a public view of a particular location, such as from pole cameras. CSLI "provides an all-encompassing record of the [cell phone] holder's whereabouts," id. at 2217, "beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," id. at 2218. There is no equivalent analogy to what is captured by the pole camera on the public street, which is taking images of public views and not more. A pole camera does not track the whole of a person's movement over time.

The Carpenter Court reasoned that CSLI creates "otherwise unknowable" data and is as comprehensively invasive for law enforcement to use "as if it had attached an ankle monitor to the phone's user." Id. That is not this situation, and pole cameras are plainly not an equivalent to CSLI. The pole camera here captured only a small slice of the daily lives of any residents, and then only when they were in particular locations outside and in full view of the public. Pole cameras are fixed in place and do not move with the person as do cell phones generating CSLI. In many ways, as described earlier, this pole camera

captured _less_ information about Moore and Moore-Bush than someone on the street could have seen and captured.

D.  <u>The Language from Supreme Court Cases on Which Bucci Relied Requires Reversal of the District Court</u>

Because they were not altered in <u>Carpenter</u> or any other case, the principles in the case law relied on in <u>Bucci</u> continue to be good law.  The government argued that the cases cited in <u>Bucci</u> have "the most closely on-point holdings" and "provide the same support for the conclusion that use of a pole camera is not a 'search' that they did when <u>Bucci</u> and cases like it were decided."  We agree.  The concurrence is wrong to say that <u>Bucci</u> misreads the Supreme Court precedents on which it relies.  If anything, <u>Carpenter</u> reinforces <u>Bucci</u>'s reading of these existing precedents, and we remain bound by Supreme Court precedent to reach the same conclusion this court did when it decided <u>Bucci</u>.  It remains true, as a general matter, that:

> The Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

<u>Katz</u>, 389 U.S. at 351 (internal citations omitted); <u>see also</u> <u>Ciraolo</u>, 476 U.S. at 213 (quoting a portion of the language from <u>Katz</u> copied above).

The government also argues that nothing in Jones or Jardines purports to overrule the rule of Katz and Ciraolo that a person does not have a reasonable expectation of privacy in the actions he or she exposes to the public view. Indeed, the majority opinions in Jones and Jardines are inapposite because they rely on a trespass theory, not a reasonable expectations theory.

Our analysis must be "informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" Carpenter, 138 S. Ct. at 2214 (quoting Carroll v. United States, 267 U.S. 132, 149 (1925)). Justice Scalia's majority opinion in Kyllo establishes that, at the time of adoption of the Fourth Amendment, "[v]isual surveillance was unquestionably lawful because 'the eye cannot by the laws of England be guilty of a trespass.'" Kyllo, 533 U.S. at 31-32. Indeed, Justice Scalia's opinion in Kyllo quoted Boyd v. United States, 116 U.S. 616, 628 (1886), which itself quoted from English law, Entick v. Carrington, 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (K.B. 1765).

Bucci cited Kyllo. Bucci, 582 F.3d at 117. In Kyllo, the Court affirmed that "the lawfulness of warrantless visual surveillance of a home has still been preserved." Kyllo, 533 U.S. at 32. By granting Moore-Bush and Moore's suppression motions, the district court broke with the original understanding of the Fourth Amendment as found by the Supreme Court.

Kyllo also aids our analysis in another way. The issue
there concerned "the use of a thermal-imaging device aimed at a
private home from a public street to detect relative amounts of
heat within the home." Id. at 29. In particular, in holding that
the use of a thermal-imaging device is a search, the Court
distinguished between this uncommon and then new technology and
technology that is "in general public use." Id. at 34.

E.   No Exception to Stare Decisis Applies for Other Reasons

Even absent the explicit limiting language in Carpenter,
Carpenter's reasoning does not undermine Bucci's reasoning.
Moore-Bush and Moore disagree and make the following argument.
Bucci rests on what they characterize as a categorical statement:
"An individual does not have an expectation of privacy in items or
places he exposes to the public." Bucci, 582 F.3d at 117 (citing
Katz, 389 U.S. at 351). "That legal principle is dispositive
here." Id.

Carpenter, on the other hand, contains the following
passage that, in the words of the district court, seems "to cabin
-- if not repudiate -- that principle": "A person does not
surrender all Fourth Amendment protection by venturing into the
public sphere. To the contrary, 'what [one] seeks to preserve as
private, even in an area accessible to the public, may be
constitutionally protected.'" Carpenter, 138 S. Ct. at 2217
(alteration in original) (quoting Katz, 389 U.S. at 351-52).

The alleged tension between these two statements, according to the defendants, "offers a sound reason for believing that the former panel [in <u>Bucci</u>], in light of fresh developments, would change its collective mind," permitting this panel to revise otherwise binding horizontal precedent. <u>Williams</u>, 45 F.3d at 592. There is no such reason.

The referred-to passage from <u>Bucci</u> and the "cabining" language from <u>Carpenter</u> both quote from the same decision, <u>Katz</u>. And the specific quotes at issue immediately follow one another in the opinion. <u>Katz</u>, 389 U.S. at 351. It is true that <u>Katz</u> said generally, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." <u>Id.</u> It then provided a possible exception to that rule: "[b]ut what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." <u>Id.</u> <u>Bucci</u>'s statement that the general rule "is dispositive here" certainly meant that no established exception applied in that case, not that no exceptions exist. <u>Bucci</u> quoted <u>Katz</u> at page 351, and the exception was raised in the very next sentence of the opinion in <u>Katz</u>.[12]  Indeed, here, the only images recorded were those of

_____

[12]    In a Fed. R. App. P. 28(j) letter, Moore stated that the government cited <u>Vega-Rodriguez</u> v. <u>Puerto Rico Telephone Co.</u>, 110 F.3d 174 (1st Cir. 1997), to support the "categorical rule" in <u>Bucci</u> that "an individual does not have an expectation of privacy in items or places he exposes to the public." The government did no such thing. It cited <u>Vega-Rodriguez</u> for the proposition that

the front areas of Moore's house, exposed to the view of any member
of the public.  Defendants clearly did nothing to seek to preserve
those views as private.

       Moreover, as discussed above, Carpenter did not purport
to alter Katz as to what constitutes a search when law enforcement
uses traditional technology.[13]  Instead, it rooted its analysis in
existing case law, which was untouched or affirmed in Carpenter.
Carpenter and Bucci are not in tension for several reasons.  One
is that they rely on the same case law foundation.  And we note
that it is up to the Supreme Court, not this court, to address
arguments that anything in the Katz line of cases has been
overruled.  See Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
490 U.S. 477, 484 (1989) ("[T]he Court of Appeals should . . .
leav[e] to this Court the prerogative of overruling its own
decisions.")

---

"the mere fact that the observation is accomplished by a video
camera rather than the naked eye, and recorded on film rather than
in a supervisor's memory, does not transmogrify a constitutionally
innocent act into a constitutionally forbidden one."  Id. at 181.
This, too, remains good law.

       [13]  Further, the district court erred in interpreting
statements of general law made in a Fourth Amendment case as it
did.  "Fourth Amendment analysis is renownedly fact specific."
United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004), vacated
on other grounds by Champagne v. United States, 543 U.S. 1102
(2005).  Chief Justice Marshall's warning from almost two centuries
ago applies here: "It is a maxim not to be disregarded, that
general expressions, in every opinion, are to be taken in
connection with the case in which those expressions are used."
Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399 (1821).

Nor can any basis for overruling Bucci be found in the Carpenter Court's reference to "some basic guideposts" in Fourth Amendment jurisprudence, including the amendment's goals of "secur[ing] 'the privacies of life' against 'arbitrary power'," Carpenter, 138 S. Ct. at 2214 (quoting Boyd, 116 U.S. at 630) and "plac[ing] obstacles in the way of a too permeating police surveillance," id. (quoting United States v. Di Re, 332 U.S. 581, 595 (1948)).  These general principles were firmly in place before Carpenter (and Bucci) and acknowledged in Carpenter as such.  Id.

We agree with the government that nothing in Jones undermines the principle from Katz and Ciraolo, repeated in Bucci, that a person does not have a reasonable expectation of privacy in the actions he or she knowingly exposes to public view.  No basis for revisiting Bucci can be found in Carpenter's noting that five justices, in concurrences written by Justice Alito and Justice Sotomayor, had agreed in the 2012 case Jones that a GPS tracker attached to someone's car could violate someone's expectation of privacy in the whole of their physical movements.  Id. at 2217 (citing Jones, 565 U.S. at 430 (Alito, J., concurring in judgment); id. at 415 (Sotomayor, J., concurring)).  The Carpenter Court reasoned that this would apply with equal force to CSLI.  But it did so by closely analogizing between the two technologies, stating that CSLI, like GPS information, "provides an intimate window into

a person's life" because it "provides an all-encompassing record of the holder's whereabouts." Carpenter, 138 S. Ct. at 2217.

As the Sixth Circuit has noted in affirming the denial of a motion to suppress evidence obtained from pole cameras, the concurrences in Jones are easily distinguished on this point. The concurrences were concerned "that long-term GPS monitoring would 'secretly monitor and catalogue every single movement," United States v. Houston, 813 F.3d 282, 290 (6th Cir. 2016) (quoting Jones, 565 U.S. at 430 (Alito, J., concurring in judgment)), and "generate[] a precise, comprehensive record of a person's public movements," id. (quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)).[14]  Information obtained from pole cameras does not give rise to the same concerns.

---

[14]    The Sixth Circuit again rejected this argument in United States v. May-Shaw, 955 F.3d 563, 567 (6th Cir. 2020). In addition, several district courts have also considered the issue, and they have all found that pole cameras still do not constitute a search. See United States v. Fanning, No. 1:18-cr-362-AT-CMS, 2019 WL 6462830 (N.D. Ga. May 28, 2019); United States v. Gbenedio, No. 1:17-CR-430-TWT, 2019 WL 2173994 (N.D. Ga. May 17, 2019); United States v. Kelly, No. 17-cr-175-pp, 2019 WL 2137370 (E.D. Wis. May 16, 2019); United States v. Harris, No. 17-CR-175, 2019 WL 2996897 (E.D. Wis. Feb. 19, 2019); United States v. Kubasiak, No. 18-CR-120, 2018 WL 6164346 (E.D. Wis. Aug. 23, 2018); United States v. Tirado, No. 16-CR-168, 2018 WL 3995901 (E.D. Wis. Aug. 21, 2018); United States v. Kay, No. 17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018); United States v. Tuggle, No. 16-cr-20070-JES-JEH, 2018 WL 3631881 (C.D. Ill. July 31, 2018). The Sixth Circuit affirmed the constitutionality of pole cameras after the Supreme Court's decision in Jones. See Houston, 813 F.3d 282.

Recently, the Supreme Court in <u>Ramos</u> v. <u>Louisiana</u> had an extensive discussion of the role of stare decisis in deciding constitutional cases, with various justices laying out their own tests for when to overrule precedent. <u>Ramos</u>, 140 S. Ct. 1390. None of their respective tests suggest that we should understand <u>Carpenter</u> as having overruled or modified existing Fourth Amendment precedent so as to put it in tension with our analysis in <u>Bucci</u>.

The majority opinion in <u>Ramos</u>, written by Justice Gorsuch, states that the Court should consider "the quality of the decision's reasoning; its consistency with related decisions; legal developments since the decision; and reliance on the decision." <u>Id.</u> at 1405 (quoting <u>Franchise Tax Bd. Of Cal.</u> v. <u>Hyatt</u>, 139 S. Ct. 1485, 1499 (2019)).[15]

The decisions in <u>Katz</u> v. <u>United States</u>, 389 U.S. 347 (1967) (Stewart, J.), <u>Smith</u> v. <u>Maryland</u>, 442 U.S. 735 (1979) (Blackmun, J.), <u>California</u> v. <u>Ciraolo</u>, 476 U.S. 207 (1986) (Burger, C.J.), and <u>Kyllo</u> v. <u>United States</u>, 533 U.S. 27 (2001) (Scalia, J.), cannot be called less than high-quality. As described above, nothing before or since those decisions draw into question their reasoning. And law enforcement has substantially relied on these

---

[15]   Justice Sotomayor joined this part of the majority's opinion, while also filing a concurrence.

precedents to deploy surveillance technologies like pole cameras
in countless criminal investigations.

In this case, law enforcement officers relied on these
precedents in deciding not to obtain a warrant for the pole camera,
both when it was initially installed and later as they continued
to use the camera over an eight-month period during this major
drug crime conspiracy investigation.  This was not an example of
law enforcement installing a camera without even reasonable
suspicion.  Before the camera was installed, a CW, acting on the
government's orders, purchased four guns illegally from Moore-
Bush, through Dinzey, at Moore's house.  Evidence obtained from
the pole camera after it was installed was used in successful
wiretap and search warrant applications starting in July 2017 and
continuing throughout the fall and winter.  Their reliance interest
is particularly strong here, where evidence obtained after a short
period of surveillance likely could have supported a warrant
application and showed the need for continuing surveillance.

As stressed by the government in their briefing, law
enforcement's reliance interest is not limited to just this case.
Pole cameras are often used by law enforcement officers to show
that they exhausted other investigative techniques before seeking
a warrant for a more invasive surveillance.  See, e.g., United
States v. Bregu, 948 F.3d 408, 411 (1st Cir. 2020) (noting that
pole camera evidence was used to obtain a warrant for cell phone

location information); United States v. Figueroa, 501 F. App'x 5,
6 (1st Cir. 2013) (unpublished) (same for wiretap).  Indeed, law
enforcement did so in this case.  As the government has argued,
affirmance of the district court would call into question other
surveillance technologies that similarly have been used for
decades, which would be in direct conflict with the Supreme Court's
statement in Carpenter that it did not call into question
"conventional surveillance techniques." Carpenter, 138 S. Ct. at
2220.  This is particularly true if it were to call into question
the use of security cameras, which have long been used for
continuing surveillance over time and, for the reasons discussed
above, are hard to distinguish from pole cameras.  It is hardly an
answer to these reliance concerns to say that law enforcement can
no longer rely on clear Supreme Court precedent and First Circuit
precedent in Bucci and must take refuge in the good faith doctrine,
as the concurrence suggests.

Although the court in Ramos overruled the relevant
precedent in that case, Apodaca v. Oregon, 25 U.S. 404 (1972)
(plurality opinion), it did so because Apodaca was "unusual" in
the way the opinions were divided 4-1-4.  Ramos, 140 S. Ct. at
1399 (quoting McDonald v. Chicago, 561 U.S. 742, 766 n.14 (2010)).
We note that, of all the cases that stand for the proposition that
there is no objective privacy interest in what is exposed to public
view, none were similarly divided.

The dissent in Ramos was even more concerned with the
harm of upsetting reliance interests than the majority was.  Id.
at 1436-39 (Alito, J., dissenting).  In particular, it highlighted
the state's interest in the finality of its verdicts and warned of
a "potential tsunami of litigation" following the majority's
ruling.  Id. at 1436.  If we were to interpret Carpenter as
overruling part of the Court's existing Fourth Amendment legal
framework, it would raise the same concerns.

The Justice Kavanaugh's partial concurrence lays out a
three-part test for when to overrule precedent: if the precedent
is "egregiously wrong"; it has "caused significant negative
jurisprudential or real-world consequences"; and "overruling the
prior decision [would] unduly upset reliance interests."  Id. at
1414-15.  Again, there is nothing to suggest that any of the
Supreme Court cases relied on by Bucci are wrong, let alone
"egregiously wrong."  Pole cameras are commonly used by law
enforcement and, particularly in their current iteration, have not
had significant negative real-world consequences.  The
government's reliance interest in the sustained use of the pole
camera was significant.  Had the government been put on any notice
that it needed to obtain a warrant to continue surveillance, it

likely would have sought and obtained a warrant early on based on the new evidence the camera revealed.[16]

The district court's view of <u>Carpenter</u> also conflicts with other binding First Circuit precedent. This court has already rejected the proposition that <u>Carpenter</u> produced "a sea change in the law of reasonable expectation of privacy," <u>United States</u> v. <u>Morel</u>, 922 F.3d 1, 8 (1st Cir. 2019), and consequently, that argument also cannot provide a basis. In <u>United States</u> v. <u>López</u>, 890 F.3d 332, 340 (1st Cir. 2018), this court declined to invoke the second exception where we had already rejected a party's interpretation of Supreme Court case law in an unpublished opinion.

Finally, this court has never found the second exception to the law of the circuit to be permissible in the face of such explicit commands from the Supreme Court. To the contrary, we have declined to apply the exception where the Supreme Court explicitly narrowed its holding. <u>See</u> <u>Wallace</u> v. <u>Reno</u>, 194 F.3d 279, 281 (1st Cir. 1999) ("Although this provision might appear to channel judicial intervention in all deportation matters to the

---

[16] Justice Thomas's opinion concurring in the judgment noted his disagreement with "the Court's typical formulation of the <u>stare decisis</u> standard . . . because it elevates demonstrably erroneous decisions -- meaning decisions outside of the realm of permissible interpretation -- over the text of the Constitution and other duly enacted federal law." <u>Ramos</u>, 140 S. Ct. at 1421 (quoting <u>Gamble</u> v. <u>United States</u>, 139 S. Ct. 1960, 1981 (2019) (Thomas, J., concurring in judgment)). Again, there is no indication that any of the existing Fourth Amendment cases relevant here were wrongly decided.

court of appeals, the Supreme Court concluded that section 242(g) governed only three specific decisions by the Attorney General . . . .").

### III.

We reverse and remand with instruction to deny the motions to suppress.

### -Concurring Opinion Follows-

BARRON, <u>Circuit Judge</u>, concurring in the judgment. When a catcher flashes the sign for a fastball rather than a curve, he takes the risk that the runner on second will tip off the batter to the pitch that's coming.  But, while that runner's sign stealing breaks no rules, his team's does if it involves hiding a high-resolution video camera with zooming capacity behind the wall in center field, recording every move that the opposing catcher makes behind the plate, and using that video log to keep hitters in the know for all nine innings.  See <u>Statement of the Commissioner from Robert D. Manfred, Jr., Commissioner of Baseball</u>, Major League Baseball  (Jan.  13,  2020),  https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf.

The  defendants  in  this  case  share  Major  League Baseball's intuition that expectations of privacy are not merely the residue of technological capacity.  They ask us to be guided by it, however, for a more consequential purpose than setting the rules for America's pastime.  They ask us to rely on it to find that the Fourth Amendment of the United States Constitution bars law  enforcement's  warrantless  and  suspicionless  use  of surreptitious, unrelenting remote-control video surveillance of the entryways of private residences.

The  defendants  concede  that  --  at  least  to  some significant extent -- both their home's side entrance and its garage  were  knowingly  exposed  to  public  view.    They  thus

acknowledge that they knowingly took the risk of exposing their comings and goings to and from their home to the equivalent of the runner on second -- whether an undercover detective in the bushes across the street or a neighbor walking his dog.

But, the defendants contend, law enforcement's warrantless use of a remotely controlled video camera stealthily affixed to a neighborhood utility pole, supplying a live feed to the station house, and trained on those parts of their residence without relent for eight months still interfered with their reasonable expectations of privacy. And, for that reason, they contend, it still constituted a search that violated the Fourth Amendment.

For most of our nation's history, the most vigilant voyeur could not replicate this kind of surveillance of the concededly observable but often intimate daily activities of life that occur so close to home. For that reason, the defendants contend, society should be prepared to accept the legitimacy of their expectation of privacy in them, even though their unblinking and ceaseless electronic monitoring is now possible. Otherwise, the defendants -- like the amici -- warn that, given the pace of innovation, law enforcement will have license to conduct a degree of unchecked criminal investigatory surveillance that the Fourth Amendment could not possibly have been intended to allow. See Br. for The Center for Democracy & Technology at 19-25 (describing how

technological advances, such as facial recognition software and
rapid search capabilities, will enable pole cameras, and thereby
law enforcement, to be more intrusive and efficient in the
immediate future).

Based on this concern, the District Court ruled that the
government's continuous, unmanned, and warrantless video
surveillance of the defendants' movements in and out of their
residence did interfere with their reasonable expectation of
privacy. For that reason, it granted the defendants' motions to
suppress all evidence traceable to the pole camera, as the
government had offered no reason for concluding that, insofar as
its use constituted a search, it was a constitutional one.

The government's appeal from that ruling raises the two
distinct questions that the majority's opinion addresses. The
first is whether one of our own precedents from 2009, United States
v. Bucci, 582 F.3d 108 (1st Cir. 2009), requires that we reverse
the District Court and accept the government's contention that the
video surveillance at issue here did not violate the defendants'
reasonable expectation of privacy and thus did not constitute a
search for Fourth Amendment purposes. The second is whether, even
if Bucci does not compel that outcome, we are nonetheless bound to
reach it as a matter of stare decisis, due to the United States
Supreme Court's post-Bucci decision in Carpenter v. United States,
138 S. Ct. 2206 (2018).

- 44 -

I agree with my colleagues' conclusion that Bucci, per the law-of-the-circuit doctrine, stands in the way of the defendants' contention that the surveillance here amounted to a search. I do not agree, however, with my colleagues' further suggestion that Carpenter not only prevents us, as a panel, from concluding that Bucci called it wrong, but also requires us, as a Circuit, to conclude that Bucci called it right.

If that were so, then Bucci's one-paragraph analysis of this constitutional issue would suffice as our Circuit's explanation for why, seemingly, whole neighborhoods may be subjected to this type of warrantless surveillance without law enforcement first having to offer up so much as an articulable suspicion that it will turn up evidence of a crime. In my view, Carpenter is better read to be but the Supreme Court's latest sign that we must be more attentive than Bucci was in its brief discussion of the Fourth Amendment to the risk that new technology poses even to those "privacies of life" that are not wholly shielded from public view. Carpenter, 138 S. Ct. at 2214 (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)). And, because that sign is one that we are obliged to steal, I thus read Carpenter, if anything, only to underscore the need for us to reconsider Bucci en banc.

## I.

Bucci held that the use of a video pole camera pointed at the front door of the defendant's home for eight months was not a search because such surveillance did not interfere with any objectively reasonable expectation of privacy that the defendant had.    See 582 F.3d at 116-17.    Under the law-of-the-circuit doctrine, that no-search ruling controls the outcome for us here unless: (1) it "is contradicted by subsequent controlling authority, such as a decision by the Supreme Court, an en banc decision of the originating court, or a statutory overruling," United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018) (citing United States v. Rodríguez, 527 F.3d 221, 225 (1st Cir. 2008)), cert. denied, 139 S. Ct. 579 (2018); or (2) "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind," id. (citing Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)).

The defendants respond that Bucci rested on a single "legal principle" that it deemed to be "dispositive":    "An individual does not have an expectation of privacy in items or places he exposes to the public." 582 F.3d at 117 (citing Katz v. United States, 389 U.S. 347, 351 (1967)("[T]he Fourth Amendment protects people, not places.    What a person knowingly exposes to

the public, even in his own home or office, is not a subject of
Fourth Amendment protection.")).  But, the defendants go on to
point out, Carpenter, which held that the government's subpoena of
the cell-site location records of a defendant from his cell phone
carrier constituted a "search" subject to the Fourth Amendment,
explained that "[a] person does not surrender all Fourth Amendment
protection by venturing into the public sphere."  138 S. Ct. at
2217.  And, the defendants then note, even though the target of
the "surveillance" in Carpenter had not taken explicit steps to
"preserve" that information "as private," id. (quoting Katz, 389
U.S. at 351), the Court held that he had a reasonable expectation
of privacy in it in part because "society's expectation has been
that law enforcement agents and others would not -- and indeed, in
the main, simply could not -- secretly monitor and catalogue" such
information, id. (quoting United States v. Jones, 565 U.S. 400,
430 (2012) (Alito, J., concurring in judgment)).

        The defendants contend that these passages from
Carpenter give a "new gloss," Rodríguez, 527 F.3d at 222, to the
single legal principle on which Bucci claimed to have relied, such
that we must conclude that the panel in that case now "would change
its collective mind," id. at 225 (quoting Williams, 45 F.3d at
592).  They thus argue that, as the District Court held, Carpenter
at least triggers the second exception to the law-of-the-circuit
doctrine.

I am not persuaded that Carpenter strips Bucci of its precedential force, given the differing factual contexts in which the two cases arise. See Williams, 45 F.3d at 592 (noting that the second exception "pertains to . . . relatively rare instances"). In Bucci, the defendant's movements all occurred on his own property. Yet, the panel there explained, he had not shielded that property from outside prying eyes by, say, erecting a privacy fence or planting a tree. 582 F.3d at 116-17. The "surveillance" at issue in Carpenter, however, was of the defendant's movements all over town and thus in places over which he had no control akin to that of the defendant in Bucci. See Carpenter, 138 S. Ct. at 2218. That meant that those movements occurred where the target of the "surveillance" could not undertake the kinds of countermeasures that Bucci highlighted. Thus, because Carpenter did not have any occasion to address whether the failure to take them might bear on the reasonableness of one's expectation of privacy in going in and out of one's own home, I cannot say that we, as a panel, are free to disregard Bucci based on Carpenter.

Still, it is important to keep in mind that the law-of-the-circuit doctrine provides an orderly means by which a Circuit may operate through panels until it collectively decides that its precedent requires revision through the en banc process. I thus think it is important to explain my disagreement with the

additional suggestion that my colleagues make, which is that <u>Bucci</u> controls not just this panel but our Court because <u>Carpenter</u> -- far from casting doubt on <u>Bucci</u> -- "reaffirms" what it held.  Maj. Op. at 22.  For, in making that contention, my colleagues necessarily conclude not merely that our panel must accept a prior panel's holding, but also that our Circuit must do so because the Supreme Court has held the same.

**II.**

In making that additional holding, my colleagues point first to the fact that <u>Carpenter</u> "explicitly protect[s] conventional surveillance techniques."  Maj. Op. at 22.  But, I do not read that statement in <u>Carpenter</u> to affirm <u>Bucci</u>.

<u>Carpenter</u> did describe the acquisition of the cell-site location records at issue in that case as having been enabled by "modern cell phones," which, unlike predecessor phones, "generate[] increasingly vast amounts of increasingly precise" cell-site location information.  138 S. Ct. at 2212.  It is also true that, as my colleagues note, published cases involving the use of video pole camera surveillance date back to the late 1980s. <u>See</u> <u>United States</u> v. <u>Cuevas-Sanchez</u>, 821 F.2d 248, 250-51 (5th Cir. 1987) (finding that law enforcement's use of a video pole camera to surveil the backyard of a home protected by a ten-foot-high privacy fence was a Fourth Amendment search).

But, the first commercial cell-site tower was erected years _before_ the first opinions about video pole camera surveillance that my colleagues highlight were issued, _see_ Jon Van, _Chicago goes cellular_, Chi. Trib. (June 3, 2008), http://www.chicagotribune.com/nation-world/chi-chicagodays-cellular-story-story.html, and the use of locational records from those towers by law enforcement began at least as early as 2001, _see_ United States v. _Forest_, 355 F.3d 942 (6th Cir. 2004), _vacated sub nom._ _Garner_ v. _United States_, 543 U.S. 1100 (2005). I doubt that _Carpenter_ meant to embrace a construction of the Fourth Amendment that would cast doubt on law enforcement's use of sophisticated technologies to conduct surveillance if they emerged just over a decade after the bicentennial of the Constitution but endorse them if they occurred on its eve. Thus, in referring to "conventional surveillance techniques and tools," _Carpenter_, 138 S. Ct. at 2220, I do not understand the Court to have signaled that it had in mind even a quite contemporary variant of the stakeout rather than simply its age-old predecessor.

My colleagues also rightly point out, however, that _Carpenter_ expressly names "security cameras" as a type of "conventional" surveillance tool, Maj. Op. at 24 (quoting _Carpenter_, 138 S. Ct. at 2220), and they contend that video pole cameras like the one used here "are easily thought" of as "security cameras," _id._ at 3-4. For that reason, they conclude that

- 50 -

Carpenter made clear, in this one brief passage, that it did have the kind of surveillance that Bucci confronted -- and that we confront here -- very much in mind.

But, "security camera" is hardly the only way -- or even the most natural way -- to describe a pole camera like the one at issue either in Bucci or this case. Conventional "security cameras" are typically deployed by property owners to keep watch over their own surroundings, not as a law enforcement tool for conducting a criminal investigation by peering into property owned by others. In fact, that Carpenter had only "security cameras" of the former ilk in mind would appear to be evidenced by the opinion's choice to make its one reference to them in the very same sentence that clarifies that the Court "do[es] not disturb" the case law that addresses a person's expectation of privacy in information voluntarily handed over to third parties, 138 S. Ct. at 2220 (discussing United States v. Miller, 425 U.S. 435 (1976) and Smith v. Maryland, 442 U.S. 735 (1979)). The following sentence -- in which the Court explained that the opinion also was not "address[ing] other business records that might incidentally reveal location information," id. (emphasis added) -- further supports the conclusion that the Court was referencing "security cameras" as a "business" record, rather than as a tool deployed by law enforcement to conduct criminal investigations by surveilling the comings and goings on the thresholds of private homes. And,

consistent with this same understanding, the government itself explains in its briefing to us that "a 'security camera' is typically a private recording system that law enforcement would access under the third-party doctrine."

That a governmental entity intent on protecting its own property -- such as a municipal transit authority watching over its tracks and trains -- may employ such video surveillance in the same manner as a private business owner is of no moment for purposes of construing this aspect of Carpenter.  We may assume that Carpenter meant to treat the government in its role as property owner no differently from a private business with respect to the use of security cameras for purposes of monitoring places under its control.  For, even with that assumption in place, I do not see how Carpenter's reference to "security cameras" is best read impliedly to bless a police department's warrantless and suspicionless use of a video pole camera continuously and secretly to surveil the entryways of a private home in an effort to make a criminal case rather than merely to keep watch over its own parking lots or station houses as a standard safety precaution that property owners now routinely take.

Of course, even security cameras used in this conventional manner by private businesses to keep watch over their own surroundings -- or by governmental entities to patrol theirs -- may, in certain instances, pick up images of ordinary

people on a public sidewalk or street.  They might even, in certain
cityscapes, capture people going in and out of their residences,
depending on how the camera is aimed.

But, the fact that such cameras -- to say nothing of
cell phones -- capture more and more of the publicly visible spaces
that we find ourselves in hardly suggests to me that Carpenter's
reference to "security cameras" is properly read to be a holding
that no one now has a reasonable expectation of privacy in their
presence in any place in public view that some other property
owner -- whether private or public -- might incidentally record.
And, that being so, I cannot see how Carpenter may be read to go
even a step further and to hold -- by virtue of its reference to
"security cameras" -- that the months-long, uninterrupted video
surveillance of the activities surrounding one's home by law
enforcement invades no privacy expectation that society should be
prepared to accept.  In fact, I note that Carpenter said nothing
about security camera footage of someone else's home, let alone
about such footage when it is picked up not in passing by another
property owner's camera, but by law enforcement's use of one for
months for the dedicated purpose of capturing every moment of what
transpires in the curtilage of that residence.[17]

_____

[17] The government is no ordinary property owner, of course,
given the kinds of property that it controls.  As my colleagues
note, for example, the City of Springfield, Massachusetts uses its
cameras to monitor for "[t]raffic light configurations,"

For these reasons, I do not read _Carpenter_ to have had law enforcement's use of video pole cameras like the one at issue here in mind when it expressly identified the categorical limit on its holding that my colleagues highlight.  Insofar as there is any doubt on that score, moreover, it is entirely proper for us, as circuit judges, not to assume that the Court coyly made such a far-reaching and never-before-announced holding.  And that is especially the case when, to do so, we would have to conclude that the Court made it implicitly and in passing in the course of an opinion that otherwise makes such a point of highlighting the constitutional concerns raised by law enforcement's ever-increasing capacity to engage in the perfect surveillance of

---

"[t]raffic backups," "[r]oad closures," "[c]onstruction projects," "[s]now plow progress," and "[r]oad conditions," and for "get[ting] a real time look" when responding to "resident and business complaints."  _Real Time Camera's assist DPW_, City of Springfield (Dec. 24, 2013 7:46 AM), https://www.springfield-ma.gov/dpw/index.php?id=cameras.  The further one gets from the traditional private property owner's use of video surveillance to keep watch over what they own, however, the less plausible it becomes to me to conclude that _Carpenter_ meant blithely to sign off on the notion that the government's use of that type of surveillance technology for security rather than law enforcement necessarily poses no threat to individual expectations of privacy or that such use, in and of itself, renders any such expectation of privacy in even one's comings and goings to and from one's own home unreasonable, if such expectation is asserted to support a contention that the continuous surveillance of those activities by a government "security camera" constitutes a search.  The _reductio_ of this observation makes the point well enough.  _See, e.g._, Paul Mozur & Aaron Krolik, _A Surveillance Net Blankets China's Cities, Giving Police Vast Powers_, N.Y. Times (Dec. 17, 2019), https://www.nytimes.com/2019/12/17/technology/china-surveillance.html.

activities that, in a lower-tech world, were clothed in practical anonymity. Thus, in my view, Carpenter's important caveat that its holding does not "call into question conventional surveillance techniques and tools, such as security cameras," 138 S. Ct. at 2220, has no bearing on the question before us.

III.

There does remain the fact that my colleagues find that Carpenter "leaves intact" the case law on which Bucci relied, Maj. Op. at 26, and I agree with them that this body of precedent does hold that, at least ordinarily, a person has no reasonable expectation of privacy in the activities in which they knowingly engage in public view. Carpenter is a self-avowedly "narrow" ruling, 138 S. Ct. at 2220, and it is important that we not read it to be more disruptive than it inherently is.

But, that same body of precedent, which I agree Carpenter did not overturn, also contains -- quite expressly -- important strands that qualify the proposition on which Bucci relied on it for about the extent of our expectations of privacy in public. And, because Carpenter, in my view, is best read to draw out those very strands from those well-settled precedents, I do not read it to affirm Bucci simply because it does not call into question several of the key cases on which Bucci relied. Rather, I read Carpenter at least to raise the question whether Bucci read those cases -- which we continue to be bound to follow -- correctly in

concluding that they afforded so little Fourth Amendment protection to the defendant in that case.

For example, Carpenter does reaffirm Katz, on which Bucci relied, just as my colleagues assert.  Indeed, Bucci supports the conclusion that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public," 582 F.3d at 117, by quoting these two sentences from Katz:  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  Id. (alteration in original) (quoting Katz, 389 U.S. at 351).

But, immediately following those two sentences, Katz also includes a critical third sentence that Bucci did not mention: "But what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351.  And, notably, it is this omitted third sentence from Katz that Carpenter relied on to conclude that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere," 138 S. Ct. at 2217, in the course of holding that law enforcement's use of technology to surveil a person can, even when that person is in public, invade a reasonable expectation of privacy, id.; see also id. (noting that a "majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements,"

even when those movements are in public (citing <u>Jones</u>, 565 U.S. at 430 (Alito, J., concurring in judgment); <u>id.</u> at 415 (Sotomayor, J., concurring))).

<u>Bucci</u> also cited, as my colleagues note, the portion of <u>California</u> v. <u>Ciraolo</u>, 476 U.S. 207 (1986), which, citing <u>Katz</u>, explained that the "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." <u>Id.</u> at 213; <u>see</u> <u>Bucci</u>, 582 F.3d at 117. And, as my colleagues note, <u>Carpenter</u> left <u>Ciraolo</u> no less intact than it left <u>Katz</u>.

But, here, too, it is hard to see how <u>Carpenter</u> could be thought thereby impliedly to have endorsed <u>Bucci</u>'s sweeping notion that one lacks a reasonable expectation of privacy in places that one exposes to public view. <u>Ciraolo</u> held that a plane carrying law enforcement could conduct an aerial observation of a backyard at a height of 1000 feet, and thus it did not address unrelenting surveillance. 476 U.S. at 213. Moreover, the opinion repeatedly states -- in passages that <u>Bucci</u> did not cite -- that it upheld only "naked-eye observation." <u>Id.</u> at 213; <u>see also</u> <u>id.</u> at 210, 212 n.1, 213, 215. For these reasons, I do not read <u>Ciraolo</u> to endorse the idea that the necessarily fleeting gaze of a single passerby -- even if aggregated with the similarly casual observations of other flaneurs -- somehow equates to electronic

surveillance of the more systematic and unrelenting kind that Bucci confronted.

Finally, Bucci cited to the Supreme Court's decision in Kyllo v. United States, 533 U.S. 27 (2001), in explaining that the Court had "not[ed] [the] lawfulness of unenhanced visual surveillance of a home." 582 F.3d at 117.  In doing so, Kyllo did emphasize, as my colleagues rightly note, that when the Fourth Amendment was adopted, "[v]isual surveillance was unquestionably lawful because 'the eye cannot by the laws of England be guilty of a trespass.'"  533 U.S. at 31-32 (quoting Boyd, 116 U.S. at 628). And, as my colleagues also rightly note, Carpenter itself invoked and affirmed Kyllo.

But, Bucci did not address Kyllo's admonitions to courts to "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted," 533 U.S. at 34, and not to leave privacy -- and particularly privacy of the home -- "at the mercy of advancing technology," id. at 35.  Yet, Carpenter quoted and relied on this very portion of Kyllo, 138 S. Ct. at 2214, and went on to explain that "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken,'" id. at 2217 (quoting Jones, 565 U.S. at 429 (Alito, J., concurring in judgment)).  Thus, Bucci did not address the practical fact that

Carpenter suggests, based in part on Kyllo, might well matter most in a case involving sustained surveillance over many months by a video pole camera -- that it would be highly unlikely that law enforcement officers could sit outside a home without being spotted and observe and catalog every activity that occurred over every moment of that period of time.

Nor, I should add, did Bucci address Kyllo's statement that, even if "the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development." 533 U.S. at 36. Yet, Carpenter quoted and affirmed that precise instruction, 138 S. Ct. at 2218-19, which is particularly pertinent to this type of surveillance, given the pace of technological innovation when it comes to video, see Br. for The American Civil Liberties Union and The American Civil Liberties Union of Massachusetts at 19 (discussing a camera installed at Boston Logan International Airport around ten years ago that, from 150 meters away, can see any object as small as a centimeter-and-a-half wide); see also Br. for The Center for Democracy & Technology at 19-25 (explaining that camera technology that could be applied to pole cameras in the future allows law enforcement to clandestinely observe small details with great accuracy and that video analytic software enables the rapid and targeted search of volumes of information, as well as provides facial recognition capabilities).

Given the portions of Katz, Ciraolo, and Kyllo that Bucci
did not address, and the light that Carpenter shines on those
portions, there is reason to question, then, whether Bucci was
right to read those cases to support the conclusion that it reached
rather than to require the opposite one.  Thus, while my
colleagues' discussion of stare decisis and the fact that Carpenter
did not overrule Katz, Ciraolo, and Kyllo is indisputably correct,
it is also, in my view, of no consequence to any question that we
must answer.  If Bucci is wrong, it is not because Carpenter
rejects the Supreme Court precedents on which Bucci relied.  If
Bucci is wrong, it is because Carpenter confirms -- by making it
even clearer in retrospect than it already was -- that Bucci
misapplied those precedents from the get-go, by failing to give
any apparent weight to those aspects of them that pointed against
its conclusion.

To the extent that my colleagues' stare decisis concerns
are instead meant to provide a reason for us not to reconsider
Bucci en banc because it is precedent within this Circuit, I cannot
agree.  One of the functions of reconsidering our precedent en
banc is to ensure that our Court's precedent accords with the
understandings of the Supreme Court.  See Fed. R. App. P. 35.  We
thus honor the doctrine of stare decisis -- rather than flout
it -- when, as a Circuit, we reconsider our own panel opinions to

ensure that they align with those of the Supreme Court, past and
present.

IV.

I do not mean to suggest from this comparison of
Carpenter's treatment of Katz, Ciraolo, and Kyllo to Bucci's
treatment of them that Bucci has been stripped of its power to
bind this panel by Carpenter's gloss on them. As I have already
emphasized, Bucci focused on the lack of "fences, gates, or
shrubbery" protecting the defendant's home. 582 F.3d at 116. In
doing so, it identified a factor that arguably bears on the
reasonableness of the defendant's expectation of privacy from the
surveillance that he faced that the surveillance of the defendant
in Carpenter simply did not implicate. Thus, I do not see how our
panel may read Carpenter to free us from adhering to that prior
panel ruling, even if we have doubts about its reasoning.

Nevertheless, I do want to emphasize that Bucci's
treatment of that factor is itself concerning for reasons that are
independent of those that I have already given. For, in
highlighting the countermeasures that the defendant there failed
to take, Bucci gave no apparent consideration to a variety of
factors, including municipal zoning regulations and homeowner
association rules, to say nothing of cost, that commonly disable
a person from erecting barriers to protect against long-term
surveillance of their residences entryways and garages, and not

only in suburban settings.  Thus, Bucci did not consider whether
one should have an expectation of privacy -- from unrelenting,
24/7, perfect law enforcement surveillance -- in coming and going
from one's home, even if for reasons of time, circumstance, local
laws, or cash there are no hedgerows to protect against such
surveillance.

Relatedly, Bucci failed to account adequately, in my
view, for those precedents that were then in place -- and that
still are -- that suggested a reason to be particularly concerned
about the privacy interests that were threatened by the special
nature of the pole camera's target -- the immediate area
surrounding the home -- given the activities that take place there.
See U.S. Const. amend. IV (protecting the "[t]he right of the
people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures"); Oliver v. United
States, 466 U.S. 170, 180 (1984) ("[T]he curtilage is the area to
which extends the intimate activity associated with the 'sanctity
of a man's home and the privacies of life' and therefore has been
considered part of home itself for Fourth Amendment purposes."
(quoting Boyd, 116 U.S. at 630)).  Indeed, in Ciraolo, which Bucci
did rely on, the Court made a point of emphasizing the concerns
raised by surveillance of that area, though Bucci did not discuss
that portion of that opinion.  See Ciraolo, 476 U.S. at 212-13
("The protection afforded the curtilage is essentially a

protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.").

These limitations in <u>Bucci</u>'s analysis loom even larger than they otherwise might after <u>Carpenter</u>, notwithstanding the different kind of surveillance that it addressed. <u>Carpenter</u> made clear that it was concerned that the surveillance tool in that case gave law enforcement an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" 138 S. Ct. at 2217 (quoting <u>Jones</u>, 565 U.S. at 415 (Sotomayor, J., concurring)). Yet, under <u>Bucci</u>, law enforcement's warrantless use of a hidden video camera, supplying a continuous live but also searchable feed to the station house, is permitted without any judicial oversight, seemingly even if such a camera is trained on every home in America. And that is so, notwithstanding that the "time-stamped data," <u>Carpenter</u>, 138 S. Ct. at 2217, that such constant recording creates may include real-time images of our children playing outside in our yards, our friends coming to meet us where we live, and our guests arriving for gatherings of a religious or political nature, to mention only those of life's privacies around the home that are least likely to cause us embarrassment or even shame.

So, while I do not read Carpenter to permit us, as a panel, to disregard Bucci, I do, for these reasons, too, read Carpenter to underscore the need for us to reconsider Bucci as a Court. Nor do concerns about reliance interests -- which matter greatly in the stare decisis calculus -- provide a reason, in my view, for us to be so wary of shifting course from Bucci that we must stand by it even if it is wrong. It is never too late for a Circuit to ensure that its own precedents align with those of the Supreme Court, and the government's reliance interests in our own prior precedent here are not strong.

In the event that we were to overrule Bucci en banc, the good faith exception to the exclusionary rule, see Davis v. United States, 564 U.S. 229, 232 (2011); cf. United States v. Leon, 468 U.S. 897, 920-22 (1984) -- which the District Court happened to have found that the government waived in this case -- would likely provide all the protection that the government would need from challenges to its use of such video pole cameras during the period when Bucci was good law. There is thus no tidal wave of backward-looking litigation in the offing as there may be in some cases.

The reliance interest that the government has in the future use of such surveillance, moreover, is, as best I can tell, nonexistent. The government had decades of experience using eavesdropping technology without a warrant prior to the Supreme Court's decision in Katz. See Goldman v. United States, 316 U.S.

129, 135 (1942) (upholding the warrantless use of a detectaphone);
Olmstead v. United States, 277 U.S. 438, 470 (1928) (upholding
warrantless wiretapping).  But, that did not stop the Supreme Court
from holding that such a practice violated the Fourth Amendment
once it concluded that it did.  See Katz, 389 U.S. at 359.  That
a means of surveillance might have provided useful evidence in the
past cannot create a going-forward reliance interest that
insulates its deployment from constitutional challenge in the
future.

### V.

I close with one final observation.  Our Circuit, not so
long ago, confronted a question as to whether to adopt an approach
to the Fourth Amendment that would be attuned to the threats to
privacy posed by new technological realities despite the absence
of precedent compelling us to do so.  See United States v. Wurie,
728 F.3d 1 (2013) (considering whether the search-incident-to-
arrest exception to the warrant requirement allowed officers to
search a seized cell phone following the defendant's arrest).  We
opted then to adopt that privacy-protective approach, as we were
concerned that any other one would "create 'a serious and recurring
threat to the privacy of countless individuals.'"  Id. at 14
(quoting Arizona v. Gant, 565 U.S. 332, 345 (2009)).

The following year, the Supreme Court upheld our
decision.  See Riley v. California, 573 U.S. 373 (2014) (declining

to extend the search-incident-to-arrest doctrine to allow law enforcement to conduct warrantless searches of modern cell phones). It did so in the course of emphasizing once again the threats that technological advances pose to Fourth Amendment rights. See id. at 393-95.

The questions that this case raises strike me as similar in kind. Practical limitations of law enforcement budgets may constrain the circumstances in which ever-present video surveillance of our homes' entryways by hidden pole cameras zooming in on us will occur. So, too, might democratic objection. But, at present, Congress has placed no legislative limits on law enforcement's use of such cameras to investigate crime, even though there is no reason to believe that the lack of such legislation is a consequence of popular approval of the practice. We thus have no such legislative judgment to grant deference.

Especially after Carpenter, and what it retrospectively confirms about how a prior panel of ours may have misread some of the key Supreme Court decisions in this area, we should not approve this degree of unchecked law enforcement surveillance based on only the more-than-decade-old paragraph of analysis that Bucci provides. The sense of privacy that we take for granted -- even when in public -- is, as Carpenter confirms, important to protect. But, it bears emphasizing, the decisions that even lower courts make about whether to protect it do more than affect the evidence

that may be used in particular criminal cases against particular defendants who have been secretly recorded. They shape -- collectively -- the society in which we live by helping to frame the expectations of privacy of even those who are not surveilled about the freedom that they enjoy under the Constitution.

The awareness that such surveillance is permitted -- and that we should all expect that it is -- may do as much to constrain our sense of what we are free to do as any actual surveillance. It is thus the expectations of privacy that society is prepared to accept as legitimate, more than the exclusion of evidence that courts order in response to them, that ultimately make it possible for people to go about their lives in ways that reflect that our society is in practice -- and not just in name -- a free one.

Accordingly, although I concur in the result that the majority reaches, I think it is important to make it clear that I do not share the view that it is one that the Supreme Court has already approved. Rather, in my view, the proper course for our Court is to use this case to give <u>Bucci</u> fresh consideration en banc, so that we may determine for ourselves whether the result that it requires is one that the Supreme Court's decisions, from <u>Katz</u> to <u>Carpenter</u>, prohibit.[18]

---

[18] There is an issue about how a court could implement this expectation of privacy if it depends for its existence on the

---

duration of the surveillance. But, courts often confront durational issues in the context of the Fourth Amendment, <u>see</u> <u>Carpenter</u>, 138 S. Ct. at 2217 n.3 (finding that "accessing seven days of [cell-site location information] constitutes a Fourth Amendment search"); <u>United States</u> v. <u>Knotts</u>, 460 U.S. 276, 283-85 (1983) (upholding law enforcement's use of a device to track a vehicle for a single car trip but cautioning that "different constitutional principles may be applicable" if technology allowed for "twenty-four hour surveillance of any citizen of this country . . . without judicial knowledge or supervision"); <u>cf.</u> <u>United</u> <u>States</u> v. <u>Sharpe</u>, 470 U.S. 675, 685 (1985) (explaining that, in considering an investigative stop under <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968), there is "no rigid time limitation" and there may be "difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest"), so that difficulty does not strike me as a dispositive one. Similarly, there is an issue whether there may be limitations short of the requirement to obtain a warrant or to show probable cause that would ensure that the use of a pole camera like this one is not "unreasonable." U.S. Const. amend. IV (protecting the "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"); <u>cf.</u> <u>Commonwealth</u> v. <u>McCarthy</u>, 142 N.E.3d 1090, 1110 (Mass. 2020) (Gants, C.J., concurring) (addressing the standards for permitting law enforcement's use of a searchable database of license plates). But, that question only arises if <u>Bucci</u>'s no-search holding no longer binds.